UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA 00 AUG -4 AM 8: 48
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

RAYMOND A. WEST,                          )
                                          )
    Plaintiff,                            )
                                          )
    vs.                                   )        CV 99-BU-3156-S
                                          )
UNITED STATES PIPE & FOUNDRY              )        **ENTERED**
COMPANY, INC.,                            )
                                          )        AUG 0 4 2000.
    Defendant.                            )

---

## MEMORANDUM OPINION

---

Plaintiff Raymond A. West sued his former employer, Defendant United States Pipe and Foundry Company, alleging that Defendant failed to accommodate his disability, asthma and chronic bronchitis, reprimanded him in retaliation for requesting accommodations, and terminated him on the basis of his disability and/or in retaliation for requesting accommodations. (Doc. 1 ¶¶ 18, 22)  Defendant has moved for summary judgment on all claims of Plaintiff.[1]  (Doc. 20)  The parties have submitted evidence and arguments in support of their positions, which the Court has reviewed.  Based on the record before the Court and for the reasons set forth below, the Court finds that

---

[1]In his brief, Plaintiff argues that he suffered a hostile work environment due to retaliatory harassment.  This argument seems to arise from his claim of retaliation with regard to discipline, i.e., the reprimands.  As Plaintiff's complaint does not contain a claim for a hostile work environment based on retaliatory harassment, such claim is not before this Court.

Defendant's motion for summary judgment (Doc. 20) is due to be granted and Plaintiff's claims are due to be dismissed.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment provides the parties an opportunity to test the mettle of a case before it ever reaches trial.  On a motion for summary judgment, the court assesses all of the proof the parties bring to bear in order to ascertain whether there is a genuine need for a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)).  Summary judgment is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The moving party's burden is not meager; it must illuminate for the court the reasons why the nonmoving party cannot or does not raise a genuine issue of material fact sufficient to support a trial.  *Id.*  The moving party's burden was set forth in *Clark* as follows:

Page 2 of  20

> The moving party bears the initial burden to show the district court, *by reference to materials on file*, that there are no genuine issues of material fact that should be decided at trial. *Only* when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. *Even after Celotex it is never enough to simply state that the non-moving party cannot meet its burden at trial.*

*Id.* (citing *Celotex*, 477 U.S. at 323-25, 106 S. Ct. 2553-54)(emphasis added)[2]

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); *see Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's

---

[2]The Eleventh Circuit recognized that *Celotex* created "an exception to the *Adickes* rule for [an] uncommon situation," i.e., "when neither party could prove either the affirmative or the negative of an essential element of the claim." *Clark*, 929 F.2d at 607, 608. In this "uncommon situation," the *Celotex* exception allows a moving party to carry its burden by showing or "pointing out," by reference to record, that the non-moving party cannot prove its claim. *Id.* at 607. Obviously, this case does not fall into the "uncommon situation." addressed in *Celotex*. *See* Def. Brief, p. 14.

opposition." *Id.*; *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied sub nom.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 513. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## II.    STATEMENT OF FACTS

Defendant hired Plaintiff in 1977 as an hourly mechanic. In November 1988, he was promoted to third-shift general mechanical maintenance foreman where he remained, with one exception not at issue in this case, until his termination on May 1, 1998. Defendant

contends that it terminated Plaintiff because of his long-term performance, attendance, and tardiness problems. Plaintiff alleges that Defendant terminated his employment because he has asthma, which he says constitutes a disability covered by the Americans with Disabilities Act ("ADA") and in retaliation for requesting certain accommodations. Also, he claims that Defendant failed to provide him with reasonable accommodations for his asthma and chronic bronchitis and that it retaliated against him because he requested such accommodations.

Plaintiff worked at Defendant's North Birmingham Plant, which operates on three shifts to manufacture cast iron pipe for sale to its customers. The first shift is the primary production shift beginning at 7:00 a.m. and ending at 3:00 p.m. During this shift, Defendant receives shipments of scrap metal by rail, and produces pipe, which involves: melting the metal, pouring the molten metal into casts, molding pipes, lining the pipes with cement, and finishing the pipes prior to shipment. The second shift operates from 3:00 p.m. until 11:00 p.m. with pipe production generally concluding at 4:30 or 5:00 p.m. The Plant then undergoes daily maintenance.

At the time of his termination, Plaintiff was the general mechanical maintenance foreman on the third shift, which begins at 11:00 p.m., approximately six hours after production ceases, and ends at 7:00 a.m., approximately two hours after the initial pipe production process begins. Plaintiff, as shift foreman, was told to report for work before the shift began at 11:00 p.m. Third-shift employees repair and maintain machinery and are responsible for assuring that equipment is ready for startup (melting and pouring metal),

which begins at 5:00 a.m. Defendant's revenue is dependent on pipe production, thus timely startup and continuous operation without mechanical failure is crucial.

At the time of his termination, Plaintiff was the highest ranking supervisor on the third shift, and he had primary responsibility for ensuring that the "plant started up at 4:30 every morning without fail," and "ma[king] sure that. . .jobs were being done on a time limit." Doc. 21, Exh. A at pp. 96-97. Plaintiff's focus was on ensuring that "production [got] started and rolling before the end of the [third] shift." Id. at 98. Even brief production delays could cost Defendant thousands of dollars.

Plaintiff directly supervised approximately 18 hourly employees and another supervisor, Keith Hadaway, directly supervised 8 or 9 employees. Plaintiff supervised Hadaway and he was ultimately responsible for all employees, including those directly supervised by Hadaway, on the third shift. Supervision of the shift's daily responsibilities was divided between Plaintiff and Hadaway, based on their positions, skills and experience. Hadaway worked in the finishing end of the plant, which includes the pipe run area, the cement lining area, and the painting area. Hadaway has a degree in electrical and electronic maintenance; therefore, his primary responsibility during the shift was electrical maintenance. Plaintiff, on the other hand, spent the majority of his time supervising mechanical maintenance in the delavaud area, which he refers to as "the pit."

Plaintiff was the third shift supervisor with the most experience in the delavaud area, which is where production begins as iron is poured from machine ladles into 22 to 24-foot troughs that feed into pipe molds spun by a casting machine. The casting machine produces iron pipes, which are sent to the finishing end for cooling, cement lining, and

painting. The division of third shift supervisory duties between Plaintiff and Hadaway was a function of their respective skills. The electrical maintenance performed by Hadaway required at least an Associate Degree in electronics and a familiarity with, among other things, computers, PCC controls, low voltage electronics and SCR drives. Plaintiff's experience, on the other hand, was in general mechanical maintenance and particularly maintenance of the equipment in the delavaud. Plaintiff had some knowledge of electrical maintenance, but he did not have the necessary skills or training to perform the plant-wide electrical maintenance supervisory job held by Hadaway. As the electrical maintenance supervisor, Hadaway was required to move throughout the plant, including the delavaud area, and, therefore, he did not have time to focus heavily on general maintenance in any one area. Plaintiff's work in the delavaud generally occupied most of his shift. Hadaway could not reasonably perform plant-wide electrical maintenance while supervising maintenance in the delavaud area.

Plaintiff reported directly to the mechanical maintenance supervisor on the day shift, but received much of his supervision from the next levels of management, the maintenance superintendent and plant superintendent. Shortly after Plaintiff was promoted to general foreman in 1988, Monte Burnham became the maintenance superintendent. James Canada was the plant superintendent at that time. In 1995, Canada was promoted to plant manager and Burnham replaced him as plant superintendent. Mike Lusco replaced Burnham as the maintenance superintendent. Darrell Witt was the plant's personnel director from approximately 1979 until February 1998, when he was promoted to director

of Human Resources at Defendant's General Office and Danny Frederick assumed his prior duties as the plant's personnel director.

Defendant contends that, as early as 1991, Plaintiff's tenure as foreman was "marked by chronic performance problems interspersed with brief periods of improvement." Doc. 26 at 5. It also contends that Plaintiff had problems with attendance and tardiness. Plaintiff attempts to dispute these facts by referring the Court generally to his personnel file, which contains approximately 165 pages. *See, e.g.*, Doc. 23 at vii (citing the Court to "Plaintiff's Personnel File" without a page cite or an explanation as to what the Court might hope to find within the pages of the personnel file). However, the record shows that Plaintiff had been counseled repeatedly for problems with his job performance, attendance, and tardiness. Moreover, he had been placed on a six-month probation period in August 1997 because of problems with his job performance, attendance, and tardiness.[3] Plaintiff's evidence does not dispute these facts. Plaintiff contends that Defendant did not properly document his job deficiencies, apparently because he was not written-up more often. However, Plaintiff claims that he was "continually being taken to the office and written up for every little thing." Doc. 1, ¶ 10; *see also* Doc. 21, Exh. A, exh. 16.

Immediately prior to his termination, Plaintiff was late to work 50 out of 51 days. Plaintiff testified that Lusco had told him to arrive at 10:45 p.m. – fifteen minutes before his shift started – and that Burnham had told him that he needed to arrive by 10:30 p.m. or at

---

[3]The day Plaintiff was placed on probation, his attorney at the time contacted Defendant, asking for the details of the job action. Doc. 21, Exh. A, exh. 8.

Page 8 of 20

least 10:40 p.m. Near the end of his employment, Plaintiff consistently arrived after 10:45, particularly; indeed, he often arrived after 11:00 p.m.

Following Plaintiff's probationary period, which ended in February 1998, Lusco remained concerned about his tardiness. He knew that Plaintiff had long-standing problems with punctuality, but did not realize the extent of his tardiness until he asked Frederick to review the plant's daily guard logs, which showed supervisors' arrival times. Despite acknowledged instructions to arrive no later than 10:45 p.m., and the admitted importance of arriving before the shift started, the logs revealed that between February 1 and April 30, 1998, Plaintiff arrived after 10:45 p.m. on 54 out of 56 recorded days, and after the 11:00 p.m. shift start on over 30 occasions.

After Lusco reviewed the guard log, he talked with Canada and Frederick. Frederick contacted Witt because of his experience at the plant and his personal knowledge of Plaintiff's job performance, attendance, and tardiness problems. Frederick also talked with Canada, Lusco, and Burnham, and together they decided to fire Plaintiff. They terminated Plaintiff on May 1, 1998, before the beginning of his shift. Plaintiff does not dispute that he was tardy on the times claimed by Defendant. He contends, however, that he was unclear of the time he should be at work.

Plaintiff contends that he has asthma and chronic bronchitis, and, as a result, he is limited in his ability to breathe. In late 1995, he told day shift foreman Jimmy Layton that he had asthma, was using inhalers, and wanted to avoid working in the delavaud area during startup. This was the first time he discussed his alleged disability with Defendant's supervisors. In December 1995, Lusco learned Plaintiff was using an inhaler.

Page 9 of 20

In March 1996, Defendant promoted Dan Elkins to day shift foreman to fill the position vacated by the retiring Layton.   Although Plaintiff has not filed a claim of discrimination related to this promotion, he was disappointed that he was not selected for the position.   After Plaintiff learned of Elkins's  promotion, he talked to Lusco.  He was upset and asked Lusco why he had not been considered or interviewed for the day shift foreman position.  Following his discussion with Lusco, he called Burnham, who told him to take some time off.

Plaintiff took a leave of absence -- from March 15, 1996 until April 7, 1996 -- following Elkins's promotion and admits that the promotion played a role in his absence, although personnel records indicate that the leave of absence was for "asthmatic condition."   Doc. 21, Exh. D, exh. 7.   On March 21, 1996, an attorney purporting to represent Plaintiff wrote a letter to Defendant, which stated:

> I have been asked to assist Ray West with his possible Worker's Compensation and ADA claims.  Ray is a long-time employee of U.S. Pipe and has recently been told by his physician that his industrial asthma may require alteration of his work activities.
>
> Ray is very concerned that he will lose his job at U.S. Pipe because of this probable work-related lung problem.

Doc. 22, Exh. 2, #USP0239.

During this leave of absence, Plaintiff had seen his physician, Dr. Robert Hambaugh, who gave him an off-work excuse until early April 1996.  Hambaugh wrote to Defendant on April 1, 1996, and stated:

> This patient [Plaintiff] has asthma and chronic bronchitis.  he has had prolonged exposure to industrial inhalants, which now contribute to

worsening of these problems. This exposure should therefore be reduced
or eliminated for health reasons.

Doc. 21, Exh. A, exh. 10.

After receiving the letter from Hambaugh, Witt talked to Plaintiff about his medical

problems. Witt told Plaintiff to wear a dust mask or respirator. He also asked Plaintiff to

authorize the release of his medical records. Because Hambaugh's letter recommending

eliminating or reducing exposure to industrial inhalants, Witt discussed with Plaintiff that

the third shift was non-production and, therefore, afforded the least exposure to dust or

"inhalants" of all three shifts. Witt also suggested that Plaintiff consider pulmonary function

testing to determine the type of respirator he should wear.

On June 4, 1996, Witt responded to Hambaugh's letter, writing that Plaintiff was not

exposed to significant air contaminants because there was no production on the third shift.

He also stated:

Mr. West has been employed by U.S. Pipe since February 28, 1977.
He has been a [m]aintenance supervisor on the third shift since May 22,
1984. In this capacity, he would not be exposed to any significant air
contaminants, dust, fumes, or other "industrial inhalants," because no
production operations are occurring on this shift.

Mr. West has engaged the services of an attorney, and he advises us
that Mr. West has possible . . . Americans with Disabilities Act (ADA) claims
against U.S. Pipe due to his "probable work-related lung problem." U.S. Pipe
is genuinely concerned about Mr. West's health condition; but Mr. West has
never advised the Company, or remotely implied, that he believed his work
was either the cause of his condition, or that his work contributed to the
worsening of a non work-related, pre-existing condition.

As you can easily see, U.S. Pipe has never had any indication that Mr.
West's lung problem was associated with his work. According to our
information, Mr. West has had this condition for several years, and he has
been treated by you and an unknown pulmonary specialist for an extended

period of time.  At no time previously has any one suggested his medical condition might be related to, or aggravated by, his work.

U.S. Pipe desires to do whatever it can to facilitate Mr. West with his medical condition and his job.  . . . .

. . .

In the meantime, as a means of reducing the remote possibility that Mr. West may be being exposed to any adverse air contaminants or "industrial inhalants" on this job, U.S. Pipe can provide Mr. West with a proper respirator which would reduce the possibility of him breathing such contaminants or irritants.  This should enable him to carry out his job duties without difficulty.   Please advise U.S. Pipe if this accommodation is satisfactory to you.

Doc. 21, Exh. A, exh. 9.  Witt testified that, according to OSHA tests, the only contaminant

in the air was nuisance dust and a simple dust mask would reduce Plaintiff's exposure.

Hambaugh replied to Defendant's letter and stated:

. . .[P]lease understand that I cannot determine whether any patient's claim of exposure to industrial inhalants, or any other hazard, is in fact true and accurate.   However, I can tell you that Mr. west has reversible obstructive airway disease, which inflammation can make worse. Inflammation can be caused by breathing fumes, thus triggering a bronchospasm.   It is also true that some patients have asthma without breathing fumes at all.  Thus, to whatever extent Mr. West is exposed to fumes, this exposure would be harmful.  That's all I'm trying to relate to you.

Doc. 21, Exh. A, exh. 15.

Witt testified that a pulmonary function test would help to determine the appropriate

type of respirator for Plaintiff and that he discussed this test with Hambaugh.  Hambaugh

told Witt that he had discussed the pulmonary function test with Plaintiff and that Plaintiff

said he did not need it.  Plaintiff testified that he tried to use a respirator once but he felt

like it restricted his air flow even more.  Plaintiff also testified that he felt that the dust mask

also restricted his air flow.  Plaintiff did not tell Witt that the respirator and the dust mask reduced his air flow or made his condition worse.

Plaintiff testified that he did not have asthma problems every night, but suffered from periodic flare-ups that caused chest tightness and wheezing, particularly when he got overheated or exerted himself at work.  Plaintiff used an inhaler when he suffered an asthma attack, and he had an inhaler in his truck and in his desk at work.  He did not always carry an inhaler with him; however, there was no work rule preventing him from carrying his inhaler.  In response to the question, "Did the inhaler solve the problem?" – referring to wheezing and inability to breathe, Plaintiff responded, "It always solves the problem."  Doc. 21, Exh. A at 181-82.

Witt, Lusco, and Burnham each advised Plaintiff to use a dust mask or respirator at work.  A dust mask and a respirator would reduce the amount of particles in the air Plaintiff breathed.  Additionally, Plaintiff had attended respirator training and understood their usage and availability.  He admits that both masks and respirators were available, he knew where they were kept, and he could obtain either if he wished.  There is no record evidence of Plaintiff having a medical inability to wear a mask or respirator other than Plaintiff's testimony that both made his condition worse.

Plaintiff's Complaint and EEOC Affidavit both allege that he was denied an accommodation, "although several means of accommodation were available, from permitting him to wear a mask to transfer to another position."  Doc. 1, ¶ 11; Doc. 21, Exh. A, exh. 16.  Plaintiff admits that he was offered the accommodation of wearing a mask or a respirator, but he found these accommodations unacceptable.

Page 13 of  20

Plaintiff cannot say when he first requested a transfer away from the delavaud area, but testified that it was during a meeting with Burnham, Witt and others. According to the record, the only such meeting after Plaintiff was diagnosed with asthma, was the August 1997 probation meeting. It is undisputed that there were no open positions in other work areas at that time. Plaintiff suggested a swap with Hadaway. He and Hadaway discussed the swap, although there is no evidence that Hadaway was agreeable to the change. Moreover, Defendant contends that the swap was not feasible because Plaintiff was not qualified to perform Hadaway's job and Hadaway could not cover the maintenance of the delavaud area and his electrical maintenance duties. Even if Plaintiff had taken Hadaway's job, he would still have had some duties in the delavaud and, given his own testimony, it is unclear whether he could work in the areas assigned to Hadaway. He testified that, while helping Hadaway, he had experienced breathing difficulties on the pipe run area and in the cement lining area.

On October 28, 1998, exactly 180 days after he was terminated, Plaintiff filed an EEOC charge, alleging discrimination on the basis of a disability. His charge states:

> On May 1, 1998, I was wrongfully terminated from my position as Maintenance Supervisor with U.S. Pipe & Foundry Company ("U.S. Pipe"). I had been employed with U.S. Pipe since February 28, 1977. I believe my wrongful termination is in violation of my rights as a person with a disability protected by Title I of the Americans with disabilities Act of 1990 (hereinafter "ADA"), 42 U.S.C. § 12112(a).
>
> I am a disabled person as defined by the ADA in that a) I have a physical impairment; b) I have a record of such impairment; and c) I am regarded as having such an impairment. To date, my employer has failed to accommodate me as required under the ADA. Notwithstanding my disability, with reasonable accommodation I would have been able to perform the essential functions of my job.

Page 14 of  20

Approximately one and a half to two years ago, I was diagnosed with asthma and chronic bronchitis as indicated by my physician, Robert F. Hambaugh, M.D., as a result of prolonged exposure to industrial inhalants, which now contributed to the worsening of these problems. Dr. Hambaugh wrote a letter to U.S. Pipe, dated April 1, 1996, indicating that my exposure to these industrial inhalants be reduced or eliminated. I advised my superintendent, Mike [Lusco], that I would like to get out of the "pit" as much as I could because of the breathing problems I was suffering. On one occasion, [Lusco] said he didn't know I had any problem with my lungs, so I took him to my desk and showed him my inhaler. At that time, I also informed him that I kept one in my truck, also. Once, I had an asthma attack at work and had to use my inhaler. Keith [Hadaway], foreman on the third shift, witnessed this and we talked about it. After this, I was continually being taken to the office, being written up for every little thing which I believe is in retaliation for my request of accommodation. I was not moved out of the "pit." Everyday it seemed another reason would be found to keep me in the "pit." I was continuously asked to be allowed out of the pit as much as possible to limit my exposure to the inhalants. These requests were refused. I was never accommodated even though several means of accommodation were available, from permitting me to wear a mask to transfer[ring me] to another area.

On May 1, 1998, I was informed that my employment was being terminated. Prior to my termination, I believe my employer failed to accommodate me, and also failed to transfer me, both in violation of my rights as a person with a disability protected by Title I of the ADA.

Doc. 8, Attachment. Plaintiff received a right-to-sue letter on September 9, 1999 and filed

the instant action on November 29, 1999.

## III.   DISCUSSION

### A.   FAILURE TO ACCOMMODATE

Plaintiff contends that Defendant discriminated against him in violation of the

Americans with Disabilities Act [ADA] by failing to accommodate him. Plaintiff has the

burden of identifying reasonable accommodations that were available. *Willis v. Conopco,*

*Inc.*, 108 F.3d 282, 284 (11th Cir. 1997). In this case, Plaintiff has identified two

Page 15 of 20

reasonable accommodations: (1) permitting him to wear a mask and (2) transferring him to another area. (Doc. 1 ¶ 11)

The evidence is not disputed that Plaintiff was allowed to wear a respirator and a dust mask. Indeed, Plaintiff tried both measures designed to filter the air he breathed and found both made his condition worse by restricting his air flow. There is simply no evidence that Plaintiff was denied permission to wear a respirator or a dust mask. Therefore, he has not shown that he was denied a reasonable accommodation with regard to permission to wear a mask or a respirator.

Plaintiff contends that he was denied an opportunity to transfer because he was not allowed to swap jobs with Hadaway. However, Defendant is not required to displace an existing employee in order to accommodate Plaintiff. "Reassignment to another position is a required accommodation *only* if there is a *vacant* position available for which the employee is otherwise qualified." *Willis*, 108 F.3d at 284 (citing 42 U.S.C. § 12111(9)(B))(emphasis added); *see also Turner v. Mobile Infirmary Association*, CIV.A. 96-0758-CB-M, 1997 WL 827532, *4 (S.D. Ala. Oct. 2, 1997)("Plaintiff's proof . . . fails because there is no evidence that she was qualified for the position that was vacant and there is no evidence that there was a position for which she was qualified."), *aff'd* 149 F.3d 1196 (1998); *Crumpton v. St. Vincent's Hospital*, 963 F. Supp. 1104, 1115 (N.D. Ala. 1997)("Plaintiff made general allegations in her brief that defendant did not make the necessary effort to locate and offer her a transfer that would not result in a demotion. However, plaintiff has presented no evidence indicating there were other positions at St. Vincent's that she was qualified to perform which were vacant or would have become

Page 16 of 20

vacant within a reasonable amount of time.")  The sole position Plaintiff identifies as a reasonable accommodation was occupied for the entire relevant period. Therefore, he has not shown that he was denied a reasonable accommodation with regard to swapping jobs with Hadaway.

Based on the foregoing, the Court finds that there is no disputed issue of material fact and that Defendant in entitled to judgment as a matter of law on Plaintiff's claim that he was denied a reasonable accommodation. Defendant's motion for summary judgment is due to be granted and Plaintiff's claim based on failure to accommodate is due to be dismissed.

## B.   REPRIMANDS

Plaintiff contends that he was retaliated against after he asked for an accommodation by being often reprimanded.  He contends that these reprimands represent a continuing violation.  The Court disagrees.  The Court finds that each reprimand had "the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights." *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983); *see also Sabree v. United Broth. of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 402 (1st Cir. 1990); *Roberts v. Gadsden Memorial Hospital*, 850 F.2d 1549, 1550 (11th Cir. 1988); *Malone v. K-Mart Corp.*, 51 F. Supp. 1287, 1301-02 & nn. 4-5 (M.D. Ala. 1999).

Even if the Court were to find that Plaintiff had presented sufficient evidence of a continuing violation, Plaintiff's retaliation claim based on reprimands would still be due to be dismissed because Plaintiff has not shown a single reprimand within the 180 days

Page 17 of 20

preceding the filing of his EEOC charge. *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 658 (11th Cir. 1993)("Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice."), *cert. denied*, 513 U.S. 814, 115 S. Ct. 69, 130 L. Ed. 2d 24 (1994 ); *Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1570 (11th Cir. 1987)("Although 'the precise contours and theoretical bases of [the theory of 'continuing violation'] are at best unclear,' *Berry v. Bd. of Supervisors of L.S.U.*, 715 F.2d 971, 979 (5th Cir.1983), there is general agreement that it relieves a plaintiff of the burden that all actionable conduct must have occurred within 180 days prior to the charge, so long as the complaint is timely as to the last occurrence. *Id.*; *see Glass v. Petro- Tex Chemical Corp.*, 757 F.2d 1554, 1560-61 (5th Cir.1985) (core idea is that equity may require that filing periods not begin to run until the occurrence of facts that should alert average lay person to take action); *Scott v. St. Paul Postal Service*, 720 F.2d 524, 525 (8th Cir.1983) (theory permits employee to include in initial administrative complaint acts before the limitations period, if at least one act falls within it); *cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81, 102 S. Ct. 1114, 1125, 71 L. Ed. 2d 214 (1982)(complaint alleging unlawful practices under Fair Housing Act timely if filed within 180 days of last occurrence of practice)").

The Court notes that all of Plaintiff's reprimands were received more than 180 days before he filed his EEOC charge, which was filed exactly 180 days after he was terminated. Therefore, the Court finds that there is no disputed issue of material fact and that Defendant in entitled to judgment as a matter of law on Plaintiff's claim of retaliation with

regard to reprimands. Defendant's motion for summary judgment is due to be granted and Plaintiff's claim based on retaliation with regard to reprimands is due to be dismissed.

## C.   TERMINATION

Plaintiff claims that he was terminated on the basis of his disabilities or in retaliation for requesting accommodations. Assuming that Plaintiff can establish a prima facie case of disability discrimination and retaliation related to his termination, the Court finds that Plaintiff has failed to present substantial evidence to demonstrate that Defendant's articulated reasons for his termination – poor job performance, attendance problems, and excessive tardiness – were a pretext for illegal discrimination or retaliation.   *See Abel v. Dubberly*, 210 F.3d 1334, 1338-39 (11th Cir. 2000)(citing, *inter alia*, *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir.1989); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir.1984)); *see also Palmer v. Board of Regents of University System*, 208 F.3d 969, 973 (11th Cir. 2000)("We have held that 'a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action.'" (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.1997), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998))).

Based on the foregoing, the Court finds that there is no disputed issue of material fact and that Defendant in entitled to judgment as a matter of law on Plaintiff's claims relating to his termination. Defendant's motion for summary judgment is due to be granted

and Plaintiff's claims of discrimination and retaliation based on his termination are due to be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that Defendant's Motion for Summary Judgment (Doc. 20) is due to be granted as to all of Plaintiff's claims.  The Court finds no existing disputed issue of material fact and that Defendant is entitled to judgment as a matter of law.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion granting summary judgment in favor of Defendant on all claims of Plaintiff and denying Plaintiff's Motion for Partial Summary Judgment.

DONE this **3rd** day of August, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE